IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs August 12, 2015

## STATE OF TENNESSEE v. ZAKKAWANDA ZAWUMBA MOSS, A/K/A FACE

### Direct Appeal from the Circuit Court for Lincoln County
No. 2013-CR-63    Forest A. Durard, Jr., Judge

### No. M2014-00746-CCA-R3-CD – Filed September 21, 2016

A Lincoln County Circuit Court Jury convicted the appellant, Zakkawanda Zawumba Moss, of six counts of first degree premeditated murder, and he received consecutive sentences of life in confinement. On appeal, the appellant contends that the evidence is insufficient to support the convictions, that the trial court's refusing to allow the jury to view a child witness's video-recorded interview denied him of his right to due process, that the trial court improperly admitted the testimony of four witnesses into evidence, that the trial court should have granted his requests for a mistrial, that the trial court improperly admitted photographs into evidence that were overly prejudicial and cumulative, and that the trial court improperly instructed the jury. Based upon the record and the parties' briefs, we find no reversible error and affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and CAMILLE R. MCMULLEN, JJ., joined.

Hershell D. Koger, Pulaski, Tennessee, for the appellant, Zakkawanda Zawumba Moss.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Robert J. Carter, District Attorney General; and Ann L. Filer, Hollynn Eubanks and Michael D. Randles, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

# I. Factual Background

On October 22, 2012, Lincoln County police discovered the bodies of twenty-one-year-old Amber McCaulley, sixteen-month-old Rashad Ragland, Jr., and twenty-two-year-old Chabreya Campbell in Campbell's home on Huntsville Highway and twenty-one-year-old Jessica Brown in Brown's home on Foxwood Drive. The next day, a utility worker discovered Warren Crutcher's body off a farm road in Madison County, Alabama. In May 2013, the Lincoln County Grand Jury indicted the appellant and Henry Burrell separately for six counts each of first degree premeditated murder for the deaths of the five victims and Campbell's unborn child.

At trial, Deputy Wayne Graham of the Lincoln County Sheriff's Department (LCSD) testified that about 10:00 a.m. on October 22, 2012, he responded to a "welfare check, that a child was calling some friends saying that he couldn't wake up his mother." Deputy Graham went to a home on Huntsville Highway, and a car with two women inside pulled up behind his patrol car. The home's garage door was open about three feet, and the women told Deputy Graham that they had taken the child out of the house through the garage. Deputy Graham lifted the garage door and immediately noticed a treadmill used to train fighting dogs. He said that he saw a "red trail" and that "it looked like something had been drug around and over to a little room over there in the corner." Deputy Graham thought a dog had been killed but then saw a body and a pool of blood around the body. He backed out of the garage, closed the door, and called for backup. When other officers arrived, they entered the home and found two additional bodies.

Murray Owen Blackwelder, the Sheriff of Lincoln County, testified that about 10:30 a.m. on October 22, 2012, he responded to a call from one of his deputies and went to the home on Huntsville Highway. When he arrived at the house, which was about one-half mile from the Alabama state line, an investigator advised him that three bodies were inside. Sheriff Blackwelder entered the garage and saw "a blood trail that made a semicircle and went into the utility room." The body of an adult female was lying on the floor in the room. Sheriff Blackwelder went from the garage into the kitchen and saw a deceased child lying on the living room floor with blood around the child's head. He proceeded down a hallway to a bathroom where he saw a second deceased, adult female. Her hands had been tied behind her back, something was around her neck, and she was lying face-down in the bathtub. At that time, Sheriff Blackwelder did not know the identities of the victims.

Sheriff Blackwelder testified that about 1:00 p.m., he learned that "there could possibly be another girl related to Warren Crutcher on Foxwood Drive." He sent his SWAT team to the home, and the team advised him that no one was there. About 4:00

p.m., Robert Rowe, Chief Administrator of the Lincoln County Jail, contacted Sheriff Blackwelder and told him that Vicki Afisov, one of the Sheriff's corrections officers, thought her daughter could be an additional victim. Afisov's daughter, Jessica Brown, lived in the home on Foxwood Drive. Sheriff Blackwelder told Rowe that all of the victims at the Huntsville Highway home were African-American; therefore, he did not think Brown, who was white, was a victim. However, Afisov remained concerned about her daughter, so Sheriff Blackwelder went to the home on Foxwood and had his SWAT team forcefully enter the residence. Inside, the team found Brown deceased in one bathroom and an infant alive and lying "on a pallet-type thing" in a second bathroom. The baby was the seven-week-old son of Brown and Crutcher. Sheriff Blackwelder entered the home and noticed that it had been "thoroughly searched and basically ransacked." He explained that the "eyes" of the stove had been removed, the "bottom" of the refrigerator had been removed, the cabinet doors were open, and "[t]he return vent going to the air conditioner was taken out and the filter was not there." A small handgun was on a dresser in Brown's bedroom.

Robert Rowe testified that on the afternoon of October 22, he received a telephone call from Vicki Afisov, who worked at the Lincoln County Jail. In response to the call, Rowe went to the home on Foxwood Drive where Jessica Brown lived. Afisov was worried because Brown had not been to work that day, and she asked Rowe to help her find Brown. Rowe could not get inside Brown's house but walked around the outside and looked in the windows. He saw that the inside of the home was in disarray and telephoned Sheriff Blackwelder. Subsequently, other officers arrived and went inside.

Investigator Mike Claiborne of the LCSD testified that he was part of the SWAT team that forced entry into the home on Foxwood Drive and that he was the third officer to enter the house. While the officers were searching the residence, Investigator Claiborne glanced into a bathroom and saw Jessica Brown's body in the bathtub. Her hands had been tied behind her back. Investigator Claiborne and another officer went into a second bathroom and found an infant lying on the floor.

Kelly McNabb, a line clearance coordinator for Huntsville Utilities, testified that on the morning of Tuesday, October 23, 2012, he was doing a vegetation survey on BH Reeves Road in Alabama, about two miles from the Tennessee state line. He described the area as very rural and wooded. McNabb walked into the woods to urinate and noticed a wallet containing five-dollar-bills "fanned out like a deck of cards." McNabb looked around and saw an adult male's body. NcNabb said that the body, which turned out to be that of Warren Crutcher, was lying on its left side. McNabb stated that the scene looked violent and that Crutcher "didn't just fall down." McNabb ran back to the road and called for law enforcement.

Deputy David Stamm of the Madison County Sheriff's Department (MCSD) in Alabama testified that on October 23, 2012, he was dispatched to BH Reeves Road. He described the road as a paved farm road, just south of the Tennessee state line. McNabb showed the body of an African-American male to the officer. Deputy Stamm said that the male was lying on his back, that the male was wearing a white shirt and camouflage overalls, and that the body "looked like rigamortis had started to set in."

Patricia Strickland, Amber McCaulley's mother, testified that she lived in New Market, Alabama. On the night of Sunday, October 21, 2012, Warren Crutcher picked up McCaulley from Strickland's house. Crutcher and McCaulley left in Crutcher's white car. Crutcher did not come inside Strickland's home, and Strickland never met him.

Shanea Michelle Sales, Chabreya Campbell's mother, testified that at the time of Campbell's death, Campbell had two children, Vincent "Vinnie" Crutcher and Rashad "Rico" Ragland, and lived in a home on Huntsville Highway in Fayetteville, Tennessee. Vincent was Warren Crutcher's son and was five years old at the time of the appellant's trial. Sales did not know Campbell was pregnant.

Sales testified that about noon on October 21, 2012, she spoke with Campbell on the telephone. Campbell told Sales that she and Crutcher were at Dog Days, an outdoor flea market in Ardmore, Tennessee, and that the children were with a babysitter, Asia Towles. About 10:00 a.m. the next day, Vincent telephoned Sales and said, "NayNay." Sales asked the boy how he was doing, but he would not answer. Sales did not know what was going on, so she went to Campbell's house. When she arrived, she saw yellow tape and started screaming. Vincent was with Towles, and Towles told Sales that Campbell was in the house. Sales said Campbell and Amber McCaulley knew each other from school but did not "hang out." On cross-examination, Sales acknowledged that although Campbell and Crutcher were no longer dating at the time of their deaths, they still had contact because of Vincent.

Vicki Lee Afisov, Jessica Brown's mother, testified that at the time of Brown's death, Brown lived in a home on Foxwood Drive with Warren Crutcher and their baby. The baby was born on August 30, 2012. Although Crutcher lived at the Foxwood Drive residence, he also stayed at Chabreya Campbell's house on Huntsville Highway.

Afisov testified that Brown's relationship with Crutcher began in December 2011 and that Crutcher moved in with Brown in March 2012. At first, Crutcher slept in Brown's bedroom. However, Brown later told Afisov that Crutcher had his own bedroom. Afisov said Brown kept an overnight bag in the living room that contained some clothing and other personal items. Brown claimed she kept the bag "ready to go" in case Crutcher telephoned her and "told her to be ready to leave."

- 4 -

Afisov testified that on October 22, 2012, she saw information about the Huntsville Highway crimes on the news. Afisov telephoned Brown, but Brown did not answer. Afisov learned that Brown had not shown up for work at Taco Bell and went to Brown's house. Brown did not answer the door, so Afisov looked in a window and saw that "the house was destroyed." She telephoned Robert Rowe, and he came to the home and contacted Sheriff Blackwelder. A SWAT team arrived and broke down the door.

Sue Rozar, Vicki Lee Afisov's mother and Jessica Brown's grandmother, testified that she spent a lot of time with Brown and that Brown kept a clean house. She said that Brown and Warren Crutcher had a "love/hate" relationship and that Crutcher helped around the house some but was gone often. Crutcher had his own bedroom, and Brown was not allowed to go in it. About 8:00 p.m. on Sunday, October 21, Rozar spoke with Brown on the telephone. Rozar and Brown were supposed to meet the next day, but Rozar never heard from Brown.

Deana McRae, Amber McCaulley's friend, testified that she saw McCaulley every other day and talked to her on the telephone every day. McRae last saw McCaulley on Friday, October 19 and last spoke with her about 10:30 p.m. on Sunday, October 21. McCaulley was at Crutcher's mother's house when they last spoke.

Twenty-two-year-old D'Carlos Joiner testified that he met Warren Crutcher in 2000 and that they became friends. At some point, Crutcher went to jail, and they lost contact. However, when Crutcher got out of confinement in early 2011, they "reconnected." Crutcher lived in the Huntsville Highway house, and Joiner moved in with him in September or October 2011. Joiner said he and Crutcher were like brothers and sold illegal drugs together, including marijuana, cocaine, crack cocaine, and pills. Crutcher smoked marijuana and "occasionally sipped what we call syrup." In early 2012, Joiner and Crutcher moved out of the Huntsville Highway house. Eventually, Chabreya Campbell, Crutcher's former girlfriend, moved into the home. Although Crutcher and Campbell were no longer a couple, they stayed in contact because they had a child together. Crutcher began dating Jessica Brown, and the two of them moved into a house on Foxwood Drive in early 2012.

Joiner testified that in May or June 2012, Henry Burrell got out of prison, and Crutcher brought him into the business. Each of them had a role in the drug operation: Crutcher, who was very intelligent and organized, was the leader; Joiner was his "right-hand man"; and Burrell was "a robber." The business was successful, and they went from selling drugs to "crack heads" and addicts to selling drugs to dealers. Joiner explained that "hit a lick" meant to rob someone and that "the lick" was the target of the robbery.

Joiner testified that he and Crutcher hid their drugs in the Huntsville Highway and Foxwood Drive houses but did not conduct business there. Only Crutcher, Joiner, and Burrell knew where Crutcher and Joiner lived. Burrell did not know exactly where the drugs were hidden but knew they were in the two houses. In August 2012, Joiner went to jail, which left a vacancy in the business. About one month before the crimes, Crutcher began dating Amber McCaulley, and he was staying at both the house on Huntsville Highway and the house on Foxwood Drive. Joiner said he last spoke with Crutcher from jail sometime between 2:00 and 4:00 p.m. on Sunday, October 21. Crutcher was exercising a dog on a "slat mill" at the Huntsville Highway house, and Joiner heard Burrell and some other people in the background.

Joiner testified that he and Crutcher had planned to move the business away from Huntsville, Alabama, and start a legitimate business. Burrell was not included in their plans. Joiner said that Crutcher used to carry an all-black Glock nine-millimeter, semi-automatic pistol. Crutcher also owned two AK-47s; a twenty-two-caliber rifle; an SKS rifle; and a rusty, Smith and Wesson handgun. Crutcher kept the AK-47s at the Foxwood Drive house: one in his bedroom and the other in the living room. Burrell carried a Kel-Tec nine-millimeter, semi-automatic pistol. Joiner identified Crutcher's Glock nine-millimeter, Crutcher's two AK-47s, and Burrell's Kel-Tec nine millimeter for the jury.

On cross-examination, Joiner testified that he sometimes called Burrell "Hen, short for Henry." He never heard anyone refer to Burrell as "Unc."

Matthew Cullison testified that he was employed by Securus Technologies, a communications company that served the corrections industry for inmates, their families, and their friends. Cullison identified records showing that on August 23, 2012, Warren Crutcher opened an account to pay for telephone calls. According to the records, D'Carlos Joiner made numerous calls on the account from the Madison County Metro Jail to Crutcher's cellular telephone.

Rhoda Tina Crutcher, Warren Crutcher's mother, testified that she and her son had a close relationship but that she did not drive to Tennessee often to see him. She said Warren[1] was handsome and "loved women." He sold drugs, and Henry Burrell worked for him. Ms. Crutcher last saw her son on the night of Sunday, October 21. She said that he and Amber McCaulley arrived at her home about 11:00 p.m., that she had not seen him in about two months, and that she "jumped up" and hugged him when he arrived. Warren took a shower and received a call on his cellular telephone. Ms. Crutcher heard the caller's voice and recognized it as that of Burrell. After the call, Warren and

---

[1] Because the witness shares a surname with the victim, we will refer to the victim by his first name for clarity. We mean no disrespect to the victim.

McCaulley left. Ms. Crutcher said that she telephoned Warren later that night and the next day but that he did not answer.

On cross-examination, Ms. Crutcher testified that she used to live next door to Burrell's sister and that she had "been in the same room [with Burrell] probably about twice, probably about in all, about four times because he was outside my house. I didn't like him coming in my house." Warren carried a black and silver semi-automatic handgun, and Ms. Crutcher assumed it was a nine-millimeter. She said she had never met the appellant.

Amanda Claire Wheless testified that in October 2012, she was the Assistant Branch Manager for Enterprise Rent-A-Car in Huntsville. On October 9, Jessica Brown made a rental car reservation in Warren Crutcher's name over the telephone. Brown later picked up the car, a white Hyundai Elantra, and an African-American man was with her.

Asia Towles testified that she had known Warren Crutcher since she was twelve years old and that she met Chabreya Campbell about three years before the crimes. Towles saw Campbell almost every day and babysat Campbell's two children, "Baby Rico and Vinnie," often. Towles was at the Huntsville Highway house three to four times per week, and Crutcher was there "[j]ust about every time." Towles met Henry Burrell through Crutcher and also saw him at the house. Towles stated that about two weeks before the killings, she met the appellant, whom she knew as "Face," through Crutcher and that she saw the appellant at the house twice. Towles said she saw Crutcher, Burrell, and the appellant with guns and recalled an incident in which she arrived at the house and lifted the garage door. She stated, "I guess I scared them . . . 'cause all three of them grabbed their pistols." However, they put down their guns when they realized who she was. Towles recalled another incident in which she saw Crutcher, Burrell, and the appellant "standing in a circle talking" and saw money, "dope," and guns on a table. Towles said that she saw Crutcher "hand out money" to Burrell and the appellant and that "I guess they were handling business." Towles identified a photograph of Vinnie, holding a bundle of money.

Towles testified that Baby Rico and Vinnie stayed with her at her house from Wednesday, October 17 to Sunday, October 21, 2012. Campbell picked up the children about 2:00 p.m. on Sunday. Towles's last contact with Campbell occurred about 10:30 or 11:00 p.m. on Sunday through text messages and Facebook. About 8:00 a.m. the next morning, Vinnie telephoned Towles and told her that his mother and Baby Rico would not wake up. Towles thought Campbell was still sleeping and told Vinnie to call her back. About twenty minutes later, Vinnie called again and said that his mother and Baby Rico would not get up. Towles knew the baby should have been awake by then and told Vinnie to put Campbell on the telephone. Vinnie told her that his mother would not get

up, and Towles told Vinnie that she was "on the way."

Towles testified that she, her mother, and her cousin drove to the Huntsville Highway house. Towles went to the front door and heard Vinnie, but she could not get the door open. She then heard Vinnie go to the garage door and told him how to unlock it. When Vinnie unlocked the garage door, Towles and her mother lifted it. Towles saw blood all over the garage floor, took the child out of the garage, and telephoned the police. Towles said Campbell was seven months pregnant at the time of her death and had "just started to show." Towles acknowledged that Campbell had a "baby bump" and said that "you could tell she was pregnant."

Angelee Hill testified that in October 2012, she was Henry Burrell's girlfriend. They had been dating "a year or so," and Burrell lived with her in Fayetteville. Hill had met Warren Crutcher, whom she knew as "Teenager," through Burrell, and Burrell had met Crutcher when they were "locked up together." After Burrell and Crutcher were released from confinement, they continued to associate, were friends, and sold drugs together. Later, Hill met the appellant through Burrell. The appellant lived in New Market, Alabama, and Hill met his wife and his wife's son.

Hill testified that two or three days before the crimes, she overheard Burrell tell someone on the telephone that he was going to rob Teenager. On the morning of Sunday, October 21, Hill again heard Burrell talking with someone on the telephone. Burrell wanted Hill to give the person directions to her house. However, Hill told Burrell to meet the person in the parking lot of McDonalds or Tractor Supply instead. Hill drove Burrell to Tractor Supply, and the appellant arrived in his vehicle. Burrell, who had a gun, got into the appellant's car, and Hill left. Hill said Burrell was wearing red and black Air Jordan shoes.

Hill testified that later that night, she had an anxiety attack and went to the hospital. After receiving treatment, she returned home. She tried to call Burrell, but his telephone was "dead." About 11:00 p.m., Burrell telephoned Hill from a phone number that was not his and told her to pick him up in Huntsville. Hill needed gasoline money for her Jeep, so she drove to Jessica Brown's house on Foxwood Drive because she knew Crutcher stayed there and would give her money. However, when she arrived at the house, no one answered the door, so Hill drove to a nearby gas station and counted out seven dollars in change to pay for gas. Hill spoke with Burrell on the telephone, and he directed her to an apartment complex on Sparkman Drive in Huntsville. She saw Burrell and the appellant, and Burrell threw something into the back "hatch" of Hill's Jeep and got into the front passenger seat. The appellant threw two "long" guns onto the back seat and got into the back seat. Hill said that Burrell was wearing latex gloves and that she noticed an "awful" smell. She also noticed that he was not wearing a gray hoodie he had

been wearing earlier that day.

Hill testified that the men told her to drive to the Walmart on Sparkman Drive. There, the appellant got out of the Jeep and asked Burrell if any blood was on the appellant. The appellant then went inside the store for about five minutes. When he returned, he told Burrell that "it wouldn't work." The men directed Hill to a Wavaho gas station. Burrell told the appellant "the number," and the appellant went inside the station. Hill saw the appellant standing at an ATM, "trying to do something." She said he "stayed so long" that she decided to go into the store. She went inside, stood beside him, and saw a bankcard with the name "Warren Crutcher" on it. The appellant told her that the card would not work, so they left. Hill said that the appellant was sitting in the rear passenger seat and that his window was partially down. As they approached a stop sign, she heard a "pop," which sounded like something hitting the window. She said she assumed the appellant had thrown the bankcard out of the Jeep. As she approached a bridge, the men told her to slow down. Burrell had a handful of cellular telephones and threw them out of the Jeep, one-by-one, as Hill drove across the bridge.

Hill testified that she drove to the appellant's house in New Market and that everyone went inside. Hill "knew something had happened" but did not say anything. Burrell changed clothes, and Hill and Burrell drove home to Fayetteville. As they were driving on Joe Quick Road, Burrell, who was sitting in the front passenger seat, threw his handgun and a white rag out the window. Hill said she did not know what happened to the two long guns that had been in the back seat.

Hill testified that when she and Burrell got home on the morning of October 22, Burrell was biting his lip, which was something he did when he was worried. She also noticed that he was wearing a different pair of shoes. Later that morning, Burrell gave Hill money to pay bills and took her out to eat. She said that he was acting "[g]enerous," which was unusual. About 11:00 a.m., they drove back to Alabama and picked up the appellant at his house. The appellant had a bag, and Hill saw the shirt he had been wearing the night before in the bag. The appellant directed Hill to an apartment complex in Huntsville and threw the bag into a dumpster. Hill then drove to Burrell's sister's apartment in Huntsville and backed into a parking space. The three of them got out of the Jeep, and Hill saw blood on the Jeep's "back hatch." She said she had an anxiety attack and went into the apartment to calm down. After a while, she felt well enough to leave. The appellant drove the Jeep through an automatic car wash, and Hill and Burrell dropped off the appellant at his house. Hill and Burrell then drove back to Tennessee. Hill said that after she crossed the state line into Tennessee on Huntsville Highway, she saw police cars at Chabreya Campbell's house. Hill told Burrell, "Henry, tell me you had nothing to do with what all happened over there."

Hill testified that when she and Burrell arrived home, Burrell could not sit still, was pacing, and kept going to the bathroom. Later, Hill noticed blood on the cover of her front passenger seat and "that [awful] smell." She told Burrell about the blood, and he removed the seat covers and washed them. However, the covers tore during the wash, so he threw them away. At some point, the police surrounded Hill's house and arrested Burrell. Hill gave a statement to the police, gave them consent to search her home and Jeep, and retraced her route on the night of October 21 for them.

On cross-examination, Hill acknowledged that sometime before the crimes, Burrell asked her "how [she] would feel if he hurt a girl." She said that she did not see anyone with the appellant when the appellant arrived in the Tractor Supply parking lot on October 21 and that she did not know if he was wearing gloves when he got into her Jeep that night. She acknowledged that she later saw blood on the back of the Jeep where Burrell had opened the hatch. She said she did not know if Burrell gave Crutcher's bankcard to the appellant, but she acknowledged that she heard Burrell call out a four-digit number to him.

Cynthia Sanders testified that she was the Director of Health Information at Lincoln Medical Center in Fayetteville, Tennessee. According to Hill's records, Hill arrived at the hospital at 7:47 p.m. and was discharged at 10:18 p.m. on October 21, 2012.

Janet Lauderdale, the Asset Protection Manager for Walmart in Huntsville, identified video that was recorded from the store on Sparkman Drive on October 22, 2012. The State played the video for the jury. The video showed that an African-American man entered the store at 2:37 a.m. and walked to an ATM in the customer service area. The man was at the ATM for two and one-half minutes and exited the store at 2:42 a.m.

Saivash Nikkah, an employee at the Wavaho gas station on Winchester Road in Huntsville, identified video that was recorded from the store on October 22, 2012. The State played the video for the jury. The video showed that the same African-American man from the Walmart video entered the store at 2:56 a.m. and went to the ATM. The man left the store at 2:58 a.m., re-entered the store one minute later, and returned to the ATM. An African-American woman entered the store at 3:00 a.m. and stood beside him. They left the store together at 3:01 a.m. On cross-examination, Nikkah acknowledged that the woman appeared to put her hand on the man and that she appeared to take a receipt from the machine. On redirect examination, Nikkah testified that he thought the ATM provided a receipt even if the transaction could not be completed.

Investigator Douglas Boeringer of the LCSD testified that he was one of the

SWAT team members who forced entry into the home on Foxwood Drive on October 22, 2012. After the team entered the house, Investigator Boeringer opened the door to a bathroom and discovered the body of Jessica Brown lying face-down in the bathtub. Her hands had been tied behind her back, and a ligature was around her neck. Other officers found a baby in a second bathroom.

Investigator Boeringer testified that on October 23, he learned that a body had been found "just over the state line" on BH Reeves Road in Madison County and went to that location. That afternoon, Investigator Boeringer went to a home in Fayetteville and arrested Henry Burrell on a probation violation warrant. Investigator Boeringer also spoke with Angelee Hill, and she gave consent for officers to search her home. During the search, Investigator Boeringer found an unloaded handgun magazine in the master bedroom. He later learned that the magazine had been manufactured specifically for a Kel-Tec nine-millimeter handgun. Hill also showed him a trash can containing car seat covers and floor mats.

Investigator Boeringer testified that on October 24, he learned that a car containing blood evidence had been found at an apartment complex in Huntsville. On October 25, Investigator Boeringer collected clothing from Hill that had been worn by Burrell. The next day, Hill retraced the route she took on the night of October 21 for Investigator Boeringer and Investigator Joyce McConnell. Hill, sitting in the front passenger seat of Investigator Boeringer's vehicle, first directed them to the home on Foxwood Drive, then to a gas station on Huntsville Highway, then south to an apartment complex on Sparkman Drive in Huntsville, and then to an apartment building in the Overlook Apartments. From there, Hill directed him to the Walmart on Sparkman Drive and the Wavaho gas station on Winchester Road. After leaving the gas station, Investigator Boeringer drove east on Winchester, and Hill showed the officers where items had been thrown out of her vehicle on the bridge over the Flint River. Hill then directed Investigator Boeringer to the appellant's home on Harlow Drive in New Market, Alabama, and back to her home in Fayetteville, Tennessee. On October 29, Jessica Brown's family found cocaine in the home on Foxwood Drive. Detective Boeringer described the cocaine as "a large cookie." In response to the discovery, he and Agent Caleb Utterback of the Tennessee Bureau of Investigation (TBI) went to the home to look for additional evidence.

Gerry Stevenson testified that he worked at Tires Plus on Winchester Road in Huntsville and that the shop was about one and one-half miles from the Flint River bridge. On the morning of October 22, 2012, Stevenson drove east on Winchester and saw what appeared to be a gun "clip" on the right side of the bridge. Later that day, he and a fellow employee returned to the bridge. The employee, who was wearing latex gloves, picked up the item and gave it to Stevenson. Stevenson recognized it as a gun

magazine loaded with silver, hollow-point bullets, and the bullets appeared to be nine-millimeter ammunition. Stevenson notified the MCSD.

Deputy Peter Roth of the MCSD testified that he was dispatched to Tires Plus and collected a loaded, nine-millimeter gun magazine from Gerry Stevenson. Stevenson, wearing a latex glove, handed the magazine to Deputy Roth. Stevenson said he had found the magazine on the Flint River bridge, so Deputy Roth went to the bridge and looked for a gun but did not find one.

Sergeant Ralph Harris and Deputy Stephen Phillip Morgan, reserve officers for the MCSD, testified that on the Friday after the killings, they were part of a team that searched a section of Joe Quick Road. During the search, Sergeant Harris found a white hand towel, and Deputy Morgan found a Glock 17 nine-millimeter, semi-automatic pistol. The towel was two to three feet from the gun. The State showed Deputy Morgan the Glock nine-millimeter handgun identified by D'Carlos Joiner as Crutcher's weapon, and Deputy Morgan said it looked like the gun he found on Joe Quick Road.

Sergeant T.A. Miller of the MCSD testified that on the afternoon of October 23, 2012, he and other officers went to the apartment complex on Sparkman Drive to look for a vehicle and a possible suspect. They went to building 44 and found a white Hyundai Elantra. The car was parked a few parking spaces away from a dumpster. Sergeant Miller saw reddish-brown stains that appeared to be blood on the back of the car near the tailpipe, on the driver-side rear door near the window, and on a rocker panel beneath the door. Sergeant Miller looked inside the car and saw additional stains that appeared to be blood. The officers impounded the Elantra and the dumpster. During a break in the appellant's interview with police on October 24, Sergeant Miller collected his black, LG cellular telephone.

Investigator Forrest Edde of the MCSD testified that on October 22, police officers began looking for Warren Crutcher, who was "a person of interest" in the killings at the two houses. Because Gerry Stevenson had found a gun magazine on the Flint River bridge, Investigator Edde and Investigator Donald Monroe decided to look in the river for a handgun. They looked along the bank of the river and wore waders into the water but did not find anything. The next day, October 23, they returned to search the river again, and Investigator Monroe found a handgun. Investigator Edde said Investigator Monroe found the gun in a location that was consistent with someone having thrown the gun off the bridge while traveling east from Huntsville. That same day, Investigator Edde went to BH Reeves Road in response to a body having been found there. The body was about thirty yards from the pavement, and Investigator Edde learned it was the body of Crutcher.

Investigator Edde testified that on October 26, he helped search Joe Quick Road. At some point during the search, Investigator Edde was advised that the search specifically included a white towel possibly wrapped around a pistol. Later that morning, searchers found the two items. Investigator Edde said that the towel and the pistol were on the side of the road consistent with having been thrown out of the passenger-side window of a car traveling west. On November 11, 2012, officers again searched the Flint River. They used ropes to pull boats across the river and metal detectors. During the search, they found a second handgun. Investigator Edde said the location of the gun was consistent with the gun having been thrown off the bridge while a car was traveling east from Huntsville.

Investigator Steve Finley of the MCSD testified that on October 22, 2012, he and Investigator Edde began looking for Warren Crutcher, a person of interest in the case, and went to two addresses but did not find him. Investigators Finley and Edde also went to the Flint River, and Investigator Edde waded into the water, looking for a weapon. The next day, Investigators Edde and Monroe went into the water with "devices" and located a gun. Later that day, Investigators Finley and Edde went to BH Reeves Road because someone had discovered a body. Investigator Finley spoke with a man who lived nearby, but the man had not heard a gunshot. Investigator Finley did not see any blood on the road.

Lillie Burrell, Henry Burrell's sister, testified that in October 2012, she lived in an apartment in Huntsville. She knew Angelee Hill, "Teenager," and "Face" through Henry.[2] About 1:00 p.m. on October 22, 2012, Henry, Hill, and the appellant arrived at Lillie's apartment in Hill's vehicle. While they were there, Hill had an anxiety attack, and Henry was "walking around biting his lip" as "if he had done something wrong." Lillie said that the appellant was "looking at the floor" and that the behavior of all three of them was unusual. Henry asked Lillie to drive the appellant to a car wash and gave her $10. Lillie drove the appellant to the car wash, dropped him off, and returned to her apartment. When the appellant returned to her apartment, Henry went downstairs to meet him. Lillie said that she saw a black bag on the back seat of Hill's Jeep and that the two men were looking in the bag. Shortly after the appellant returned to the apartment, Henry, Hill, and the appellant left.

On cross-examination, Lillie testified that she first met the appellant on October 22, 2012, and she acknowledged that she did not know his normal behavior. Lillie drove the appellant to the car wash in her car and was never in Hill's Jeep.

Investigator Shane Stiles of the MCSD testified that after the killings, he began

---

[2] Because the witness and Henry Burrell share a surname, we will refer to them by their first names for clarity. We mean no disrespect to the witness.

looking for "Face" and received information from an informant. On the morning of October 24, he went to a home on Harlow Drive in the area of New Market. A "younger female" came to the door and said Face had gone to the store. As Investigator Stiles was walking back to his vehicle, he saw a stocky, African-American male walking across the yard toward him. The male was carrying his lunch in a Styrofoam box. Investigator Stiles said, "[H]ey, Face, what's going on?" The male responded, "[N]ot much, what's up[?]" Investigator Stiles identified himself and told the male that some investigators wanted to speak with him. The male agreed to go with the officer, so Investigator Stiles checked the man's identification and verified that he was the appellant.

Investigator Stiles testified that he drove the appellant to the police department and that the appellant rode in the front passenger seat of the officer's SUV. During the drive, the appellant wanted to know "what this was about," so Investigator Stiles told him it related to "the stuff you've been . . . seeing on t.v." The appellant said he would help any way he could. Investigator Stiles said the appellant "got quiet there for a little while." Investigator Stiles drove on Winchester Road toward Huntsville. As he approached the Flint River bridge, the appellant "kind of sat up in the seat and looked over the rail," turning his head and neck to the right. Investigator Stiles said the appellant lifted up off the seat and that he was afraid the appellant was going to jump out. He said the appellant was "a little tense" and that he told the appellant to relax. When they arrived at the police department, Investigator Stiles told the appellant that he could eat his lunch. The appellant ate one "hot wing" and threw the rest of his lunch away.

Investigator Pete Hose of the MCSD testified that on October 22, 2012, he learned about the homicides and began searching for Warren Crutcher. The next day, he went to BH Reeves Road because a body had been found. The body turned out to be that of Crutcher. Investigator Hose said the body was on the east side of the road, was lying partially in the woods, and was almost covered by leaves. Blood appeared to be on Crutcher's face, and a wallet and money were a few feet away. Investigator Hose said the body could not be seen from the road, and he acknowledged that it appeared to have been "dumped" there. That afternoon, Investigator Hose learned a vehicle had been found at an apartment complex on Sparkman Drive. He went to building 44 and saw a white Hyundai Elantra with bloodstains on the outside of the car. Officers were also interested in a nearby dumpster and had both transported to the police department.

Investigator Donald Monroe of the MCSD testified that on October 23, 2012, he, Investigator Edde, and Investigator Finley searched the bridge over the Flint River for a gun but did not find anything. They then searched the riverbank and the river, and Investigator Monroe found a loaded, Smith and Wesson Model 59 semi-automatic handgun in the river. Later that day, Investigator Monroe was dispatched to BH Reeves Road to assist with the discovery of a body. He searched the area around the body but

did not find any evidence. He also went to the Overlook Apartments on Sparkman Drive to process the scene around the Hyundai Elantra. He said the car had been pulled into a parking space "face first" in front of building 44 and was about forty feet from a dumpster. Investigator Monroe noticed smears on the exterior of the vehicle and "thought maybe something had been placed in the dumpster that had been used to wipe the car." The police impounded the car and the dumpster.

Investigator Monroe testified that he helped process the interior of the car at the police department. The ignition keys were on the driver's floorboard. A red or brown rag, a newspaper, and an unopened Corona beer bottle were on the passenger-side front floorboard, and large, reddish-brown stains were on the front passenger seat's base and backrest, where the front passenger would have sat. Reddish-brown stains also were on the driver-side rear door, a pair of gray sweatpants was on the back seat, and a bottle of glass cleaner was on the passenger-side rear floorboard. Officers removed the front seats and found two spent shell casings under the passenger seat. They found a third casing in the door "pocket" on the front passenger door. They found a fourth casing on the driver-side back seat. An "entry point" for a projectile was in the dashboard, directly in front of the passenger seat, and the officers removed a bullet from the dashboard. They also collected a projectile from the area "where the seatbelt would be hanging for the driver," Amber McCaulley's cellular telephone from under the driver's seat, and a black LG cellular telephone from a "cubbyhole" between the front seats. A loaded .380 gun magazine was in the console between the two seats.

Investigator Monroe testified that he processed the dumpster but did not find any evidence. On October 25, he inventoried items that had been taken from the appellant's home pursuant to a search warrant. The items included a cellular telephone, a pair of white Nike tennis shoes, and two AK-47 rifles. On November 19, Investigator Monroe returned to the Flint River and searched it with Investigator Jason McMinn. They found a loaded Smith and Wesson Model 6906 handgun in the immediate area where Investigator Monroe had found the Smith and Wesson Model 59 on October 23.

On cross-examination, Investigator Monroe acknowledged that he found the second gun four weeks after and about twenty-feet away from the first gun. Both guns were rusty, and Investigator Monroe could not say they were rusty prior to being in the river. He also could not say the guns were related to the bullet holes in the Elantra or any of the shootings in this case.

Investigator Jason McMinn of the MCSD testified that he assisted with the search of the appellant's home on Harlow Drive in New Market. Investigator Hose found two AK-47s under the bed in the master bedroom, and Investigator McMinn collected a pair of white, Nike Air tennis shoes and a Samsung 2 cellular telephone from the bedroom. A

reddish-brown stain was on one of the shoes. Investigator McMinn also obtained surveillance video from the Walmart and the Wavaho gas station. On November 19, he assisted with the search of the Flint River and found a loaded Smith and Wesson Model 6906 handgun. On cross-examination, Investigator McMinn testified that he found the gun visually and that it was on a large group of boulders.

Investigator Joseph Washington of the MCSD testified that on October 23, he responded to BH Reeves Road and saw a body lying in the woodline. A wallet was four feet, five inches from the body and contained $615 in different denominations of currency, including $5 bills. A wallet was also on the body and contained Warren Crutcher's driver's license and Social Security card. Investigator Washington collected both wallets. He also collected a cigarette lighter and a beer can that were on the ground. Investigator Washington said he saw what appeared to be a "drag mark" in the soil and shoe prints. Crutcher's body was forty-seven feet, two inches from the road.

Investigator Washington testified that he attended Crutcher's autopsy. Crutcher had three gunshot entry wounds on the back of his head and one exit wound above his right eye. The medical examiner recovered two projectiles from the body, and Investigator Washington obtained Crutcher's shoes from the medical examiner. He also obtained the appellant's black Air Jordan shoes from the appellant in jail.[3] At least twice, Investigator Washington helped search the Flint River for evidence. He said a broken cellular telephone, a white towel, and a Glock handgun were found on Joe Quick Road. On cross-examination, Investigator Washington acknowledged that no shell casings or weapons were found near Crutcher's body.

Detective Brent Patterson of the MCSD testified that on October 22, 2012, Investigator Boeringer requested that he come to Lincoln County in response to the homicides, so he went to the Huntsville Highway house. He described the scene as "chaos" with media, civilians, and law enforcement present. Detective Patterson learned that Warren Crutcher was associated with the household and that Crutcher was missing. At that time, Crutcher was a "person of interest" in the case.

Detective Patterson testified that the next day, he learned that the body of an African-American male had been found on BH Reeves Road in Madison County, went to that location, and positively identified the body as that of Crutcher from Crutcher's driver's license. Crutcher appeared to have been shot multiple times in the head and did not appear to have been there for a long time. Limbs and leaves were covering the body as if someone had tried to conceal it, and Detective Patterson did not see any blood around the body. He said that based on Crutcher's injuries, a large amount of blood

---

[3] The shoes were introduced into evidence as exhibit 125. In the exhibit list, the shoes were described as "Defendant shoes -- red and black Air Jordans."

should have been under or around the body if Crutcher had been killed there. Detective Patterson also would have expected to find spent casings from a firearm, but no casings were present. The ground around the body was muddy, but the soles of Crutcher's shoes were clean except for a smear on one of them that indicated he may have been dragged to that location. Detective Patterson also noticed that leaves and twigs had been disturbed as if the body had been dragged there.

Detective Patterson testified that later that day, he learned that the police had identified two suspects, "Face" and Henry Burrell. On October 24, Detective Patterson learned that Face had been located in New Market. Detective Patterson determined that Face was the appellant, met with him, and advised him of his rights. At first, the appellant waived his rights and answered the officer's questions. The appellant claimed that he and Crutcher had mutual friends, that they were both involved in dog fighting, and that he had been at the Huntsville Highway house on October 21 to install dog conditioning equipment. The appellant said he only "knew of" Burrell. At that point, the appellant told Detective Patterson that he had nothing more to say, so Detective Patterson terminated the interview.

Detective Patterson testified that he received information that two women, Lillie and Tracie Burrell, wanted to speak with him about the killings. Based on what the women told him, Detective Patterson told Investigator Boeringer that Investigator Boeringer needed to talk with Angelee Hill. As a result of law enforcement conversations with Hill, police officers conducted searches on Winchester Road, the Flint River bridge, and Joe Quick Road and obtained video from the Walmart and the Wavaho gas station. Detective Patterson watched the videos and recognized the appellant in the Walmart video and the appellant and Hill in the Wavaho video. Detective Patterson then obtained information about the bankcard the appellant was seen using in the videos and learned the card belonged to Warren Crutcher.

Detective Patterson testified that on October 26, he was advised that the appellant wanted to speak with him, so he and Sergeant Brian Chaffin met with the appellant. At that time, the appellant knew law enforcement had searched his home and had found two AK-47s.

Detective Patterson testified that he advised the appellant of his rights and that the appellant waived them. The appellant told the officers the following: In the early morning hours of October 22, Henry Burrell came to the appellant's home and was driving "Teen's" car. Burrell requested a change of clothes and asked that the appellant "take and hold" his Berretta handgun. The appellant gave Burrell some clothes and a pair of his "Jordans" but refused to keep Burrell's gun because he "didn't need any additional problems." Burrell told the appellant that he had "made a jug," which Detective

- 17 -

Patterson understood to mean that Burrell had committed a robbery and taken someone's "dope" or money. Burrell left the appellant's house carrying the clothes and the "Jordan[s]" Burrell had been wearing when he arrived, and the appellant did not speak with him again until 5:00 or 6:00 p.m. when Burrell telephoned him. The appellant told the officers that he kept a forty-caliber Smith and Wesson and two AK-47s in his house.

Detective Patterson testified that although the appellant had claimed in his first interview that he did not know Burrell, he claimed in the second interview that he, Burrell, and Crutcher had been associates in a drug operation for the past six to eight weeks. However, Burrell thought he was being "cut out of the group." The appellant's nickname for Crutcher was "Teenager" or "Teen," and the appellant's nickname for Burrell was "Unc." The appellant claimed that Crutcher had been "shorted" during a recent drug transaction, that Crutcher and Burrell had confronted someone about the missing drugs, and that "whoever they dealt with had something to do with this." The appellant thought Burrell was responsible for the killings, and Detective Patterson acknowledged that the appellant was "basically steering [the police] toward" Burrell. The appellant told the officers that he had been at the Huntsville Highway house to condition a dog on October 21 and that a beer bottle would be in a trash can. He also made a point of telling the officers that during a drug transaction on October 21, he had been sitting in the front passenger seat of the white Elantra and that Burrell had been sitting in the back seat. Detective Patterson said that toward the end of the three-hour interview, he and Sergeant Chaffin took a break and left the interview room but that he continued to observe the appellant. He said the appellant "was in defeat mode" and "dropped" his head.

Thomas Stanfield, the Regional Manager for Wood Forest National Bank, testified that on October 22, 2012, the same bankcard that was used to set up the Securus account was used at the ATM in the Walmart on Sparkman Drive. The user requested $800 at 2:39 and 2:40 a.m. but did not receive any money.

Special Agent Wayne Wesson of the TBI testified that he was the lead investigator for this case, arrived at the Huntsville Highway house about 2:00 p.m. on October 22, 2012, and entered the garage. Shoe prints were on the floor, and a blood trail went "from the garage door in a half moon into what appear[ed] to be a utility area." A piece of plywood had been placed over the opening to the utility room, and Amber McCaulley had been dragged into the room, leaving the blood trail. McCaulley was lying on her back and appeared to have been "thrown in the position she was in." Agent Wesson said that her shirt was "kind of rolled up, as if she had been [dragged]" and that her hair was in disarray. A white sweatshirt or hoodie was on the garage floor, and a clear Corona beer bottle was in a corner of the garage. Blood was on the beer bottle. A treadmill and a trash bag containing another beer bottle were also in the garage. Agent Wesson said that

a tire track went through Campbell's blood trail, meaning that "the track was there after the blood was there," and that bloodstains were on the door that separated the garage from the kitchen.

Agent Wesson testified that he went from the garage into the kitchen and that a Kel-Tec nine-millimeter handgun was in the kitchen cabinet above the refrigerator. From the kitchen, Agent Wesson could see a child, Ragland, lying on his back in the living room "with blood streaming away from his head." Shoe prints appeared to be on the side of the child's face and part of his neck, and a partial shoe print was in the blood near his body. From the living room, Agent Wesson proceeded down a hallway in which he noticed multiple shoe prints. A chair was in the hallway directly beneath a pull-down attic door, and a shoe print was on the seat. A bathroom was to the left of the chair, and Agent Wesson saw Chabreya Campbell lying face-down in the bathtub. Her hands were tied behind her back, and a ligature was around her neck. Campbell's head was underneath the faucet, and her face was in at least three inches of water. He said she was "obviously pregnant." Agent Wesson stated that the house "appeared to be quite organized . . . with just a few items strewn about" and that he left the home just before 1:00 a.m. on October 23.

Agent Wesson testified that he went to the Foxwood Drive residence and arrived about 2:00 a.m. on October 23. He entered the front door and noticed that the doorjamb was broken, which was consistent with law enforcement having forced open the door. The interior of the house was "particularly in disarray," and the "return air vent was off the return air area, or whatever that is called." The kitchen drawers had been pulled out, one of the kitchen cabinet doors was broken off its hinges, and the "eyes" of the stove had been removed. Agent Wesson stated, "It was just apparent that someone had been through the residence, looking and digging or whatever they were doing. But, anyway, it had been gone through pretty thoroughly."

Agent Wesson testified that Jessica Brown was in the bathtub in the guest bathroom. Like Campbell, she was lying face down and had ligatures around her wrists and neck. The bathtub and her hair were wet, her face was bluish-purple and swollen, and Saran Wrap was around her legs. Agent Wesson went into the master bathroom where officers had found Brown's baby alive. Some towels were on the floor, and the cabinet doors and drawers were open. Agent Wesson saw several rounds of ammunition for an AK-47 in Crutcher's bedroom and an overnight bag in the living room. The bag looked as though it had been "ruffled through."

Agent Wesson testified that on October 30, 2012, he spoke with the appellant's wife, Lussonia Moss, and that she gave consent to search her home. Ultimately, Agent Wesson charged the appellant with the murders of the victims. He also charged Henry

Burrell with the killings in a separate indictment.

Special Agent Alex Brodhag of the TBI testified as a firearms examination expert that he examined the firearms and firearm-related evidence collected in this case. He explained that each firearm was unique in that its markings would be transferred onto the surface of bullets and cartridge cases. Agent Brodhag examined and test-fired all of the firearms, including Crutcher's Glock nine millimeter, the Kel-Tec nine millimeter allegedly owned by Henry Burrell, the Smith and Wesson Model 59 found in the Flint River, and the Smith and Wesson Model 6906 found on boulders along the Flint River. All of the weapons were operable with functional safeties.

Agent Brodhag testified that the rifling marks on the bullet recovered from the dashboard of the Elantra had "similar class characteristics as tests from the [Kel-Tec]." Therefore, he could not exclude that pistol from having fired the bullet. A second bullet collected from the Elantra and the two bullets collected from Crutcher's head were too damaged to compare them to the Kel-Tec. However, Agent Brodhag was able to determine that the Glock and the Smith and Wesson firearms did not fire them because "the rifling was wrong." One of the bullets from Crutcher's head and the bullet from the Elantra's dashboard had been fired through the barrel of the same firearm. The four cartridge cases collected from the Elantra were all fired from the same pistol but were not fired from the Kel-Tec or the Smith and Wesson firearms. Agent Broadhag said the magazine found on the Flint River bridge was a "Beretta brand" magazine and would have fit a Beretta Model 92FS. The magazine could hold fifteen cartridges but contained fourteen cartridges when Agent Brodhag received it. The gun magazine collected from the Elantra would have fit a Ruger handgun found on Jessica Brown's dresser.

Dr. Feng Li, a senior medical examiner for Metropolitan Nashville, testified as an expert in forensic pathology that he performed autopsies on Amber McCaulley, Rico Ragland, Chabreya Campbell, and Jessica Brown. McCaulley received a gunshot wound on the right side of the top of her head. The wound was a "contact" wound, meaning that the muzzle of the gun was against her skin when the gun was fired. The bullet traveled right to left, top to bottom, and front to back and exited the left side of the back of her head. Dr. Li concluded that the victim's cause of death was a gunshot wound to the head and that her manner of death was homicide. Regarding Ragland, the child's skull was broken into multiple pieces. Dr. Li saw pattern abrasions on the right side of the victim's head, on his right shoulder, and on his right upper arm and lips. The pattern was consistent with a shoe print, and the victim's blunt force injuries were consistent with his head having been stomped. Dr. Li observed red-colored bruises on the left side of the victim's head, and he acknowledged that the bruises were consistent with the left side of the head having been pressed against the hard floor while someone stomped the right side. Dr. Li concluded that the victim's cause of death was multiple blunt force injuries

and that his manner of death was homicide.

Dr. Li testified that Campbell's body arrived at his office with a black scarf ligature around the neck. The victim had multiple abrasions on her right shoulder, both feet, and both ankles that were consistent with her having been hit, dragged, or both. She also had lacerations on her lower lip. Dr. Li concluded that her cause of death was strangulation and that her manner of death was homicide. Campbell was in her third trimester of pregnancy, and the baby died as a result of Campbell's death. Dr. Li examined the baby girl and concluded that she was approximately thirty weeks gestation and viable when Campbell was killed. Regarding Brown's autopsy, Dr. Li stated that the body arrived at his office without a ligature around the neck. However, he saw marks where the ligature had been and hemorrhages on the victim's head and face that were consistent with strangulation. The victim had abrasions on her right shoulder and the back of her upper right arm that were consistent with her having been hit, dragged, or both. She also had ligature marks on both wrists. Dr. Li stated that the deaths of Campbell and Brown were similar. He concluded that Brown's cause of death was strangulation and that her manner of death was homicide.

On cross-examination, Dr. Li acknowledged that he did not know what caused Campbell's and Brown's abrasions. He also did not know what position McCaulley was in when she was shot.

Special Agent Jennifer Spivey of the TBI testified as an expert in latent fingerprints that she compared fingerprints on evidence to known fingerprints. Fingerprints on an air conditioner grate at the Foxwood Drive home did not match the appellant or Henry Burrell. A latent print on a Bud Lite beer bottle found in an outside trash can at the Huntsville Highway house matched the appellant, and fingerprints on two "ammo cans" in the home matched Crutcher. Agent Spivey examined various firearm evidence and evidence collected from the Elantra but did not find any fingerprints that she could use for analysis.

Special Agent Linda Littlejohn of the TBI testified as an expert in the microanalysis of shoe print and tire print identification. Agent Littlejohn made test impressions from the Elantra's tires and compared them to the tire tracks in the garage of the Huntsville Highway house. The tracks in the garage were consistent with the size and tread design of the Elantra's tires, but a "lack of individual characteristics preclude[d] a more conclusive analysis." Agent Littlejohn also compared shoe prints found at the home to at least six pairs of shoes submitted to the TBI, including the red and black Air Jordan shoes taken off the appellant's feet by Investigator Washington. A "gel lift" of a dusty shoe print in the garage was consistent with the size, shape, and tread design of the appellant's right shoe. A partial, reddish-brown shoe print on the white hoodie found in

the garage was consistent with the appellant's left shoe.

Agent Littlejohn testified that using digital photographs, she was able to delineate twenty-eight partial shoe prints in the Huntsville Highway house and garage. Ten of those prints were consistent with the size, shape, and tread design of the appellant's right shoe, and one was consistent with the size, shape, and tread design of his left shoe. Regarding the ten prints consistent with the appellant's right shoe, six were in the garage, and at least one of the six was near the threshold of the utility room where the police found Amber McCaulley's body. Four of the six shoe prints in the garage were made in a substance that was a combination of dust and a reddish-brown stain that Agent Littlejohn assumed to be blood. One of the ten shoe prints was in the living room, and the remaining three were in the kitchen; all four were in a reddish-brown substance that Agent Littlejohn assumed to be blood. The one shoe print that was consistent with the appellant's left shoe was located in the garage. On cross-examination, Agent Littlejohn acknowledged that she could not say definitively that the appellant's shoes made any of the prints.

Dr. Emily Ward, the Medical Examiner for Madison County in October 2012, testified as an expert in forensic pathology that she performed Warren Crutcher's autopsy on October 23. Twigs and leaf material were on the body, and blowflies had laid eggs in the nose and mouth. Dr. Ward said blowfly eggs usually were visible twelve to twenty-four hours after death. The victim had blood spatters and "bits of dirty material" on his hands, and the body was "on the passing stage of rigor mortis." The upper layers of skin on the left side of the victim's neck and on the upper part of his chest had "sluffed off," an indication of post-mortem decomposition.

Dr. Ward testified that the victim had three gunshot entrance wounds on the right side of the back of his head. One entrance wound was surrounded by a ring of black sooty material, meaning that the end of the gun was very close to or in contact with the skin when it was fired. The other two entrance wounds were surrounded by stippling abrasions, meaning that the end of the gun was within a few inches of the head when it was fired. The victim had one exit wound on the right side of the front of his head, and Dr. Ward collected two deformed, copper-jacketed, medium-caliber bullets. The victim had a "three-inch group of abrasions on the left side of his forehead" and a one- and one-half-inch linear abrasion on the back of his right forearm. Dr. Ward acknowledged that the abrasions were consistent with the victim's having been dragged by his feet. She stated that the victim's skull was shattered, that any one of the three gunshot wounds could have caused his death, and that he probably lost a lot of blood from his nose and mouth. She concluded that his cause of death was three gunshot wounds and that the manner of death was homicide.

Special Agent Laura Boos of the TBI testified as an expert in forensic serology and DNA testing that she received known DNA standards from the appellant, Henry Burrell, and the victims and compared them to DNA collected from the crime scenes. As to the Huntsville Highway house, Agent Boos reported the following significant results: DNA on the lip area of a cigarette butt in the driveway matched Warren Crutcher; DNA on the mouth of a Corona beer bottle in the yard beside the driveway matched Burrell; a "limited" DNA profile was obtained from a Corona beer bottle in an outside trash can but was consistent with the appellant's DNA; a mixture of DNA consisting of at least two individuals was present on the mouth of a Bud Lite beer bottle in that trash can, and a major contributor of the DNA was the appellant; DNA on the mouth of the Corona beer bottle in the corner of the garage was that of Crutcher; blood was on the bottle and was that of Crutcher; blood was on the white hoodie on the garage floor and was that of Amber McCaulley and Crutcher; "touch" DNA on the cuffs, collar, and pockets of the hoodie matched Crutcher; touch DNA was on the handle of a six-pack carton of beer in a trash bag in the garage, and the DNA was a mixture of at least three individuals with Crutcher being a major contributor and Agent Boos excluding the appellant and Burrell as the other contributors; blood on a beer bottle inside the trash bag and blood on the outside of the bag was that of Crutcher; touch DNA on the trash bag's handles contained a mixture of DNA from at least three individuals with Crutcher being a major contributor and Chabreya Campbell possibly being a minor contributor; blood smeared on the floor of the garage and blood on the door separating the garage from the kitchen was that of McCaulley; limited touch DNA on the attic pull-cord was a mixture of at least two individuals but was inconclusive, meaning that the appellant and Burrell could not be excluded as contributors; touch DNA was on the ligature around Campbell's neck, and the DNA was a mixture of at least two individuals with Campbell being a major contributor and Agent Boos excluding the appellant, but not Burrell, as another contributor.

As to the Foxwood Drive house, Agent Boos reported the following significant results: A mixture of touch DNA on a shoestring around Jessica Brown's wrist contained a mixture of DNA from at least three individuals, and Brown and Crutcher were major contributors while the other known standards were excluded. Agent Boos could not say Crutcher tied the shoestring around Brown's wrist, but if the shoestring came from one of Crutcher's shoes, then that could explain why his DNA was on the shoestring. A cord around Brown's neck contained a mixture of DNA from at least two individuals with Brown as a major contributor. Agent Boos excluded everyone else, except Crutcher, as the other contributors. Finally, Agent Boos found limited DNA on a shoestring around Brown's neck and excluded Brown, the appellant, and Burrell as contributors.

Agent Boos testified that testing revealed blood on one of the floor mats from Angelee Hill's Jeep and that the blood was a mixture of DNA from at least two

individuals with an unknown female as a major contributor. Agent Boos did not find blood on the car seat covers or the exterior of the Jeep. Blood was on the Jeep's interior, front passenger-side door trim and was a mixture of at least three individuals, but the sample was too limited for a more conclusive result. Blood was on the soles of Burrell's shoes. On the left shoe, Agent Boos could not exclude McCaulley or Rico Ragland as the contributors; on the right shoe, Burrell was possibly a major contributor. Blood was also on the sole of the appellant's left red and black Air Jordan shoe, but all of the known DNA standards were excluded as contributors. Agent Boos found McCaulley's and Crutcher's blood inside the Elantra with Crutcher's blood on the front and rear passenger side and McCaulley's blood on the rear driver's side. Agent Boos also found Crutcher's blood on a Corona beer bottle and newspaper collected from the car, and touch DNA on the car's front interior passenger-side door handle was a mixture of at least two individuals with Crutcher as the major contributor. Agent Boos could not exclude the appellant as another contributor. McCaulley's blood was on the car's exterior rear bumper.

Agent Boos testified that DNA was on a Kel-Tec gun magazine found on the Flint River bridge, that it was a mixture of at least two individuals, and that Crutcher was a major contributor with the remaining known standards excluded. Agent Boos did not find blood on the towel from Joe Quick Road. Touch DNA on the appellant's cellular telephone was a mixture of at least three individuals, and McCaulley was a major contributor with the other known standards excluded.

Bridget McGraw Holdren testified that in October and November 2012, she worked for the State of Alabama and knew the appellant from her employment. On November 8, 2012, Holdren met with him. At that time, she knew of the killings and knew the appellant was a person of interest in the case. At the conclusion of their meeting, the appellant asked Holdren if the police had a certain amount of time to charge him with "something." Holdren later reported her conversation with the appellant to law enforcement.

Kevin Turner, the Chief Investigating Officer for the Madison County District Attorney's Office, testified that he was trained in the investigation of the illegal drug business. He stated that a "zip" referred to an ounce of cocaine, that "loud" referred to high-grade marijuana, that "hitting a lick" meant committing a robbery, that "shake 'em down" referred to intimidating a person out of his or her drugs without committing a robbery, and that "'dem" referred to "them."

Special Agent Nicholas Christian of the TBI testified as an expert in forensic data recovery that he recovered evidence from various cellular telephones in this case. At 11:55 a.m. on October 21, 2012, a text message from the appellant's telephone was sent

to Burrell's telephone, nicknamed "Unce" in the appellant's list of contacts. The message said, "'I'm gassing up. Want me to come get you first or get him to ride with me to get you?'" One minute later, the appellant's telephone received a text message from Burrell's telephone that stated, "'Just you come get me.'" At 5:33 p.m., the appellant's telephone sent a text to "WB" that said, "'I'm coming with dude. We gonna lick.'" At 5:37 p.m., the appellant's telephone sent a second text to WB stating, "'That's what I know. That's why I try to shack 'dem.'" At 6:15 p.m, the appellant's telephone sent a third message to WB stating, "'Wit da lick.'" The last message sent from the appellant's telephone on October 21 went to "OG" at 10:20 p.m. and stated, "'Talk to me.'" At 10:59 p.m., Amber McCaulley's telephone sent a text to "Mama" stating, "'My phone finin to die. I'm coming.'" At 10:52 a.m. on October 22, the appellant's telephone sent a message to "CJ" stating, "'Got that loud. 320 is zip, for you 300.'" At 10:55 a.m., the appellant's telephone sent a message to OG that said, "'Got some for you. Who needs some loud, some zip, need you to middleman bout a bow.'" Agent Christian also recovered a photograph of two AK-47s that was taken with the appellant's telephone at 9:49 a.m. on October 24. On cross-examination, Agent Christian acknowledged that he did not know who actually sent or received the text messages.

Sergeant Adam Eubanks of the Fayetteville Police Department testified that he had been involved in cellular telephone technology investigation since 2002. Using mapping software and cellular telephone records, Sergeant Eubanks mapped the locations of cellular telephone towers that were used to make telephone calls in this case. At 1:14 p.m. on October 21, the appellant's telephone called Burrell's telephone. At that time, the appellant's telephone was in the geographic area of the Huntsville Highway house. However, by the time the call ended, the appellant's telephone had moved north toward Fayetteville. Shortly thereafter, the appellant's telephone received two calls from Burrell's telephone. At that time, the appellant's telephone was in the geographic area of Tractor Supply. At 2:33 p.m., the appellant's telephone called Warren Crutcher's telephone. The appellant's telephone was in the geographic area of the Huntsville Highway house, and it remained in that area all afternoon. Calls made from and received by Burrell's telephone that afternoon showed that it was also in the geographic area of the Huntsville Highway House. When the appellant's cellular telephone sent the text messages at 5:33, 5:37, and 6:15 p.m., the telephone was still in area of the Huntsville Highway house. Warren Crutcher's telephone was also in that geographic area at the time of the texts.

Sergeant Eubanks testified that at 10:30 p.m., the appellant's telephone received a call from the appellant's wife's telephone. At that time, the appellant was in Huntsville. Burrell's telephone received a call from Angelee Hill's telephone at 10:35 p.m. and was in the same geographic area as the appellant's telephone. At 10:35 p.m., Crutcher's telephone received a call from Jessica Brown's telephone. Crutcher's telephone also was

in Huntsville, and there was movement of the telephone during the call. At 11:00 p.m., Burrell's telephone called Crutcher's telephone, and Burrell's telephone was still in Huntsville. At 11:52 p.m., Burrell's telephone received a call from Crutcher's telephone. Burrell's telephone was still in Alabama but was in a geographic area that included BH Reeves Road. At 1:24 a.m. on October 22, the appellant's telephone called a non-target telephone number. At that time, the appellant's telephone was in the area of the Huntsville Highway house, either in northern Madison County, Alabama, or in southern Lincoln County, Tennessee. At 1:25 a.m. and 1:27 a.m., Crutcher's telephone called the same non-target phone number. Crutcher's telephone was in the same geographic area as the appellant's telephone, and that area included the Huntsville Highway house.

Sergeant Eubanks testified that records showed Angelee Hill's cellular telephone was in the geographic area of Fayetteville all day on October 21. However, at 1:46 a.m. on October 22, Hill's telephone received a call from the appellant's telephone. At that time, Hill's telephone was south of her home in Fayetteville and was in the area of Park City, Tennessee. Hill's telephone continued to receive calls from the appellant's telephone and moved south into Alabama. At 2:07 a.m., the appellant's telephone called Hill's telephone. The appellant's telephone was in the geographic area where the Elantra was later found, and Hill's telephone had moved further south into Meridianville. At 2:14 a.m., Hill's telephone called the appellant's telephone. During the call, Hill's telephone moved into the area of the Overlook Apartments in Huntsville. There was no activity from her telephone after that call until 8:01 a.m. when Hill's telephone received a call from a non-target number. At that time, Hill's telephone was in Fayetteville.

At the conclusion of Sergeant Eubanks's testimony, the State rested its case. The appellant did not present any proof, and the jury convicted him as charged of six counts of first degree premeditated murder. The trial court held a sentencing hearing to determine whether the appellant would serve his life sentences concurrently or consecutively. After the presentation of proof, the trial court ordered that the appellant serve the sentences consecutively.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support the convictions because it fails to show that he was directly or indirectly responsible for the victims' deaths, fails to show that he premeditated the killings, fails to link him to the Foxwood Drive residence, fails to show that Crutcher was killed in Tennessee, and fails to show that Campbell's pregnancy was "patently obvious." The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. See State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. See id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting State v. Marable, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). The element of premeditation is a question of fact for the jury. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. Bland, 958 S.W.2d at 660. In State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000), our supreme court delineated the following circumstances from which a jury may infer premeditation:

> [D]eclarations by the defendant of an intent to kill, evidence
> of procurement of a weapon, the use of a deadly weapon upon
> an unarmed victim, the particular cruelty of the killing,

> infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

The jury may also infer premeditation from the establishment of a motive for the killing and the use of multiple weapons in succession. State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004).

During closing arguments,[4] the State explained its theory of the killings as follows: Henry Burrell and the appellant planned to rob Warren Crutcher. On the night of October 21, 2012, Crutcher and Amber McCaulley went to Crutcher's mother's house. Burrell and the appellant were together in Huntsville, and Burrell telephoned Crutcher. After receiving the call, Crutcher and McCaulley left Crutcher's mother's house in the white Elantra and went to pick up Burrell and the appellant. The four of them left Huntsville in the Elantra with Burrell or the appellant driving, Crutcher sitting in the front passenger seat, Burrell or the appellant sitting behind Crutcher, and McCaulley sitting behind the driver. They drove to the Huntsville Highway house. When the car pulled into the garage, whoever was sitting behind Crutcher shot him in the back of the head three times. The killer then shot McCaulley in the head. The appellant and Burrell pulled McCaulley out of the back seat, dragged her into the utility room, and put a piece of plywood over the doorway to conceal her body. The two men then went inside, bound Chabreya Campbell's hands behind her back, and dunked her head in a bathtub of water to try to get her to reveal where Crutcher kept his drugs and money. When Campbell was unwilling or unable to tell them, they strangled her. After killing Campbell, they stomped the sixteen-month-old Ragland to death. Burrell and the appellant then drove the Elantra, with Crutcher's body still inside, to the Foxwood Drive residence where they killed Jessica Brown in the same manner that they had killed Campbell. After killing Brown, Burrell and the appellant ransacked the house, looking for money and drugs. They took drugs from one or both houses, and the appellant took Crutcher's AK-47s from the Foxwood Drive home. Burrell and the appellant intended to "pin" the killings on Crutcher, so they spared the lives of his two children and disposed of his body in the woods on BH Reeves Road in Alabama. Afterward, they drove the car to the Overlook Apartments, telephoned Angelee Hill, and had Hill pick them up.

---

[4] We note that the appellant failed to include the closing arguments in the record on appeal. On January 13, 2016, this court ordered that he supplement the record with the omitted arguments. As this court has repeatedly stated, it is well-established that closing arguments, in which the State would have explained its theory of the case to the jury, is an important tool for both parties during a trial. It is also an important tool for this court, particularly in a case such as this one, which involved six victims, multiple crime scenes, more than fifty witnesses, ten days of trial, fifteen transcripts, and 246 exhibits.

Taken in the light most favorable the State, the evidence supports the State's theory. Burrell, the appellant, and Crutcher were in the illegal drug business together, and Burrell knew Crutcher kept his drugs in the Huntsville Highway and Foxwood Drive houses. Several days before the victims' deaths, Burrell told someone that he was going to rob Crutcher. On October 21, 2012, Angelee Hill drove Burrell to the Tractor Supply parking lot in Fayetteville. Burrell had a gun and left the parking lot with the appellant. D'Carlos Joiner spoke with Crutcher on the telephone between 2:00 and 4:00 p.m. At that time, Crutcher was at the Huntsville Highway house, and Joiner heard Burrell and others in the background. The appellant later admitted to police that he also was at the home on October 21.

That night, Crutcher, driving the white Elantra, picked up Amber McCaulley at her mother's house in New Market, Alabama. Crutcher and McCaulley then went to Crutcher's mother's home but left in response to a call from Burrell. Telephone records and mapping of cellular telephone towers showed that about 10:30 p.m., Burrell and the appellant were in Huntsville, Alabama. However, calls made from the appellant's and Crutcher's telephones at approximately 1:30 a.m. on October 22 showed that they had returned to the area of the Huntsville Highway house. Shortly thereafter, Burrell began using the appellant's telephone to communicate with Hill. By 2:07 a.m., Burrell and the appellant had returned to Huntsville, and Burrell was directing Hill to the Overlook Apartments. When Hill picked up Burrell and the appellant in the early morning hours of October 22, Burrell was wearing gloves, and the appellant put two long guns on the back seat of Hill's Jeep. Hill later saw blood on the outside of the Jeep where Burrell had opened the back hatch. Hill drove the appellant and Burrell to the Walmart and the Wavaho, where the appellant attempted to use Crutcher's bankcard. They then drove north to the appellant's home in New Market. As Hill crossed the Flint River, Burrell and the appellant discarded guns and a gun magazine that were later recovered by police. After leaving the appellant at his home, Hill and Burrell drove to Fayetteville. During the drive, Burrell threw Crutcher's Glock handgun out the window on Joe Quick Road.

Physical evidence linked the appellant to the crime scenes on Huntsville Highway and Foxwood Drive. Specifically, bloody shoe prints inside the garage and the living area of the Huntsville Highway house were consistent with the soles of appellant's red and black Air Jordan shoes, and the appellant's DNA was on a beer bottle in the garage. The police found the Elantra at the Overlook Apartments where Hill picked up the appellant and Burrell on October 22. Crutcher's and McCaulley's blood was in the car, the car had been driven though McCaulley's blood in the garage of the Huntsville Highway house, and the appellant could not be excluded as a contributor of touch DNA found on the car's front interior passenger-side door handle. The police found Crutcher's AK-47s, which he kept at the Foxwood Drive house, in the appellant's home. In sum, the evidence shows that the appellant and Burrell intentionally killed the victims as part of

their plan to rob Crutcher.

Regarding the appellant's claim that the evidence fails to show premeditation, Burrell told someone several days before the crimes that he was going to rob Crutcher. On the morning of October 21, Burrell had a gun when he met the appellant at the Tractor Supply. That afternoon, while Burrell and the appellant were at the Huntsville Highway house with Crutcher, the appellant sent text messages in which he stated that he was going to "lick," meaning commit a robbery, and that he was with "da lick," meaning the target of the robbery. On the morning after the killings, the appellant began sending text messages, stating that he had drugs for sale. Thus, the State established a motive, robbery, for the killings. Burrell and the appellant used deadly weapons upon the three unarmed women, the crimes were particularly cruel, and all of the victims except Campbell's unborn baby sustained multiple wounds. Burrell and the appellant disposed of firearms and clothing after the crimes and tried to conceal McCaulley's body by dragging it into the utility room and Crutcher's body by dumping it off a farm road in a wooded area. Thus, the evidence is sufficient to establish premeditation.

As to the appellant's claim that the evidence fails to show that Crutcher was killed in Tennessee, Crutcher's blood was on his white hoodie, a beer bottle, and a trash bag found in the garage of the Huntsville Highway house. His blood was also in the Elantra, which was driven into the garage. However, there was no blood where his body was found in Madison County, Alabama. Thus, a reasonable jury could conclude that Crutcher was killed in Tennessee.

Finally, regarding the appellant's claim that Campbell's pregnancy was not "patently obvious," Agent Wesson viewed Campbell's body in the bathtub and testified that she was "obviously pregnant." Asia Towles testified that Campbell was "showing" and that "you could tell she was pregnant." The State introduced into evidence a photograph of Campbell's body that was taken after she had been removed from the bathtub. The purpose of the photograph was for the jury to see the extent of her pregnancy. We have reviewed the photograph, and Campbell's pregnancy was clearly visible. Thus, a reasonable jury could conclude that the appellant knew Campbell was pregnant when he and Burrell killed her and, therefore, that he intentionally and with premeditation killed her baby. Thus, the appellant is not entitled to relief.

B. Recording of Child Witness

The appellant contends that the trial court violated various rights, including his right to a fair trial, his right to due process, and his right to present a defense, by ruling that the jury could not view a video-recorded interview of Vinnie Crutcher. The State argues that the trial court properly disallowed the video because the child was not

reliable. We conclude that the appellant is not entitled to relief.

At the conclusion of the State's case, defense counsel advised the trial court outside of the jury's presence that he planned "to put Vinnie on the stand. And we will see what we can do with young Mr. Crutcher." Defense counsel called Vinnie to the stand to try to qualify him as a witness. The trial court asked him numerous questions, but he would not answer. Eventually, he told the trial court that he was five years old. The court continued to ask the child questions. The trial court then had Vinnie taken out of the courtroom and stated, "He only verbalized maybe two answers at best. And that's probably an accurate statement of the record. I mean, I couldn't get him to do anything but nod his head." Defense counsel contended that Vinnie "may not be verbalizing, [but] I think that even his ability to shake his head, his ability to nod his head, his ability to shrug, we can put in the record. And those are indicative of his responses to questions." The court expressed concern about whether the child could take the oath, had the child returned to the stand, and questioned him further. The court then stated, "Let the record reflect, that . . . we got very little out of the young man in attempting to qualify him as a witness. He was more interested in playing with the microphone than anything else. . . . So, he's, obviously, not competent to testify, or at least in this setting."

Defense counsel argued that if Vinnie could not testify, then the defense should be allowed to submit a video recording of a forensic interview conducted after the crimes in which the child said he saw his daddy hurt his mama. Defense counsel played the child's interview for the court. After viewing the video, the trial court ruled as follows:

> I watched the video here with counsel and many other people present. And Vinnie is all over the place. He's three or four years old in that. And he's coloring and he's carrying on. And most . . . a lot of what I heard was having the examiner repeat back what he was saying because I couldn't quite, frankly, understand everything he said.
>
> Because that's just the nature of a three or four-year-old child.
>
> . . . . And it just does not appear that the statements are reliable. I mean, under the totality of the whole tape.

The appellant contends that he should have been allowed to play the video for the jury.

The Sixth Amendment and the Due Process Clause of the Fourteenth Amendment of the United States Constitution guarantee a criminal defendant the right to present a

defense. State v. Brown, 29 S.W.3d 427, 432 (Tenn. 2000). However, in many situations, the appellant's due process right "'must yield to other legitimate interests in the criminal trial process.'" Id. at 432 (quoting Chambers v. Mississippi, 410 U.S. 284, 295 (1973)). To this end, "[s]o long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." State v. Flood, 219 S.W.3d 307, 316 (Tenn. 2007). To determine whether a defendant's due process right to present a defense has been violated by the exclusion of evidence, we must consider:

> (1) Whether the excluded evidence is critical to the defense;
>
> (2) Whether the evidence bears sufficient indicia of reliability; and
>
> (3) Whether the interest supporting exclusion of the evidence is substantially important.

Id. at 316 (citing Brown, 29 S.W.3d at 434-35; State v. Rice, 184 S.W.3d 646, 673 (Tenn. 2006); State v. Rogers, 188 S.W.3d 593, 614 (Tenn. 2006)).

Here, the trial court ruled that the second criteria, that the evidence bears a sufficient indicia of reliability, was not met. We agree. Moreover, we are not persuaded that the evidence was critical to the defense. Even if Warren Crutcher were somehow involved in the killings at the Hunstville Highway and Foxwood Drive houses, the direct and circumstantial evidence implicating the appellant in those crimes and the death of Crutcher was strong. Thus, we conclude that the trial court's excluding the evidence did not deny the appellant his rights.

## C. Improper Testimony

Next, the appellant contends that the trial court erred by admitting the irrelevant testimony of four witnesses: Angelee Hill, Cynthia Sanders, Bridgette McGraw Holdren, and Kevin Turner. The State argues that the trial court properly admitted their testimony. We conclude that the court erred with regard to Holdren's testimony but that the error was harmless.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Tennessee Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible except as [otherwise] provided. . . . Evidence which is not relevant is not admissible."

Regarding Hill, the appellant contends that the trial court erred by allowing her to testify that two or three days before the killings, she overheard Henry Burrell tell someone over the telephone that he intended to rob Teenager. The appellant contends that the statement was irrelevant because the proof does not show that Burrell was talking with the appellant. We disagree that the testimony was irrelevant. Burrell's intent to rob Crutcher established a motive for the killings. Burrell and the appellant were close associates and were together in the hours prior to the killings. Thus, Hill's testimony was highly relevant to the State's case.

Regarding Sanders, the appellant contends that her testimony about Hill's going to the hospital on the night of October 21 was irrelevant and improperly used to bolster Hill's credibility, which had not been attacked by the defense. When the appellant objected to Sanders's testimony at trial, the State argued that her testimony was relevant to the timeline of the crimes. The trial court agreed, stating that Sanders could testify as to the times Hill checked in and out of the hospital for the limited purpose "of establishing . . . the time these murders took place." Hill testified that she went to the hospital for a panic attack prior to Burrell's directing her to Huntsville, and Sanders testified that Hill checked in and out of the hospital at 7:47 and 10:18 p.m., respectively. We agree with the trial court that Sanders's testimony was relevant to the State's timeline for the night's events.

As to Holdren's testimony, the appellant claims that the witness, who unbeknownst to the jury was the appellant's parole officer, was improperly allowed to testify that she knew the appellant was a person of interest in the case and that the appellant asked her during a meeting if the police had a certain amount of time to charge him with "something." The appellant contends that her testimony was "at a minimum irrelevant - and more likely than not, improper character evidence." As to Holdren's stating that she knew the appellant was a suspect, the State's proof established well before Holdren testified that the appellant became a suspect shortly after the bodies were discovered. Thus, even if the testimony was irrelevant, we fail to see how the appellant was prejudiced. See Tenn. R. App. P. 36(b). As to the appellant's question to Holdren, the trial court ruled that it had "some probative value" in that "[w]ould a guilty mind not make that inquiry?" We disagree with the trial court. Any suspect in a criminal case, particularly a case of this magnitude, would want to know the amount of time in which the police could charge him or her with a crime. Thus, we conclude that the appellant's question was not relevant to a guilty mind and should have been excluded. In any event, Holdren's testimony was brief, and the State's case against the appellant was strong. Therefore, we conclude that the trial court's error was harmless. See Tenn. R. App. P. 36(b).

As to Turner's testimony, defense counsel argued before Turner took the stand that the witness should not be allowed to define the term "shake 'dem" for the jury because none of the appellant's text messages included that term. Instead, one of the appellant's messages included the term "shack 'dem"; thus, Turner's testimony definition of "shake 'dem" was irrelevant. The trial court ruled that Turner could testify about the term "subject to being linked up." During Turner's direct testimony, the State asked if he was familiar with the phrase "shack them or shack 'dem." Turner answered, "I can't say I've heard the phrase shack 'dem. I've heard of shake 'em. . . . Shake 'em down." He then stated that "[s]haking them down" meant "[t]aking the dope off of them without having to do the robbery itself." The State's next witness, Agent Christian, testified about text messages the appellant sent on October 21. In one of those messages, the appellant stated that he was going to "shack 'dem." Although the appellant never said that he was going to "shake 'dem," the State's theory was that the terms "shack 'dem" and "shake 'dem" were so closely related that they could be considered the same term. Moreover, Turner admitted that he had never heard the term "shack 'dem," and the appellant had an opportunity to cross-examine the witness about the terms. Thus, we cannot say that the trial court erred.

## D. Requests for Mistrial

The appellant contends that the trial court erred by refusing to grant a mistrial when (1) the State referred to the appellant's being on probation during its opening statement; (2) Investigator Washington and Detective Patterson referred to the appellant's being in jail after the killings; and (3) Rhonda Crutcher testified that the appellant and Henry Burrell were committing robberies. The State argues that the appellant is not entitled to relief. We agree with the State.

A mistrial should be declared in criminal cases only in the event that a manifest necessity requires such action. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). In other words, a mistrial is an appropriate remedy when a trial cannot continue or a miscarriage of justice would result if it did. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial lies within the sound discretion of the trial court, and this court will not interfere with the exercise of that discretion absent clear abuse appearing on the face of the record. See State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998). Additionally, the burden of establishing the necessity for mistrial lies with the party seeking it. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

During the State's opening statement, the prosecutor told the jury, "You are going to hear testimony from the defendant's probation officer who told him he had been charged with murder in Tennessee. She is going to tell you how he reacted." After the

prosecutor finished his argument, the trial court announced that it was going to take a brief recess. The jury left the courtroom, and defense counsel objected to the prosecutor's statement. The trial court noted that defense counsel did not make a contemporaneous objection "for strategic reasons I would assume," and defense counsel replied, "Yes, sir. No sense in drawing attention." The trial court asked if defense counsel wanted a curative instruction, and counsel answered, "No, sir. Here again, I don't want to re-ring the bell."

We can appreciate defense counsel's not wanting to draw attention to the prosecutor's statement. However, defense counsel did not object to the statement or request a curative instruction. Moreover, counsel never requested a mistrial. Therefore, the issue has been waived. See Tenn. R. App. P. 36(a).

During Investigator Washington's testimony, the State asked, "At some point, did you get the defendant's shoes?" Investigator Washington answered yes, and the State handed him a brown paper bag and asked if the Air Jordans in the bag were the shoes he collected. The officer said, "Yes. . . . From the jail." After Investigator Washington's testimony, the State's next witness was Detective Patterson. Detective Patterson testified that on October 26, 2012, two days after the appellant's first police interview, he learned that the appellant wanted to speak with him. The State asked what time of day he received the request, and the officer said that he could not remember and that "I just do know that a Sergeant Scott in our jail facility reached out to me and said that Mr. Moss wished to speak with me in detail." Subsequently, defense counsel requested a sidebar for a separate issue. However, during the sidebar, the trial court admonished the State, stating, "That is the third occasion we have had about the defendant being in jail or being arrested or something. At this point in the proceedings, he hasn't been arrested [for the killings]. . . . That was totally improper." Defense counsel moved for a mistrial "based on those unsolicited comments from Investigator Washington and [Detective] Patterson." The trial court denied the motion, stating, "At this point in the trial, these jurors have a pretty good idea this guy has got a history anyway. It is not like it is foreign."

We conclude that the trial court did not abuse its discretion by denying the appellant's motion for a mistrial. Investigator Stiles testified prior to Investigator Washington's and Detective Patterson's testimony that he drove the appellant to the police department for questioning on October 24, 2012. Although the appellant was not under arrest at that time, the police obviously suspected that he was involved in the crimes. The appellant has not explained, and we fail to see, how the officers' stating that the appellant was in jail warranted a mistrial. Thus, the court did not err.

Lastly, Rhonda Crutcher, Warren Crutcher's mother, testified on direct examination that on the night her son came to her home, she "was getting on him about

what people were saying about him robbing." She then stated, "He said, well, mama, I'm not doing that. That's Henry and Face . . . that's doing that." Defense counsel objected, asked to approach the bench, and requested a mistrial. The trial court ruled that "I am not inclined to give a mistrial on this" and that "with the totality of the evidence thus far a limiting instruction will cure that particular situation." The trial court then instructed the jury, "The witness's last remarks regarding any characterization of robbery or anybody involved in any robbery is to be completely ignored by you." The trial court asked if any of the jurors would have "any trouble following that instruction" and stated, "Okay. Let the record reflect that no hands were raised."

We agree with the appellant that Ms. Crutcher's statement was improper. See Tenn. R. Evid. 404(b) (providing that evidence of other crimes, wrongs, or acts generally is in admissible). However, the trial court immediately instructed the jurors that they could not consider her statement. Generally, we presume that a jury has followed the trial court's instructions. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). Moreover, the appellant again has failed to explain how the witness's statement was so egregious as to warrant a mistrial. Accordingly, given the strength of the State's case, we decline to overrule the trial court's exercise of discretion in denying the appellant's motion. See Tenn. R. App. P. 36(b).

## E. Photographs

The appellant contends that the trial court erred by admitting unduly prejudicial and cumulative photographs into evidence. The State argues that the court properly admitted the photographs. We agree with the State.

At trial, the appellant challenged the admissibility of various photographs of the victims. Relevant to this appeal, the appellant objected to exhibit 149, showing Amber McCaulley's almost-bare back as she was lying in the utility room; exhibit 157, taken from the kitchen and showing Rico Ragland lying in the living room with blood around his head; exhibit 162, showing Chabreya Campbell after she was removed from the bathtub and turned "face up"; exhibit 196, showing Jessica Brown lying face-down in the bathtub with her hands tied behind her back; exhibit 236, showing Warren Crutcher's head after his body was found on Joe Quick Road; exhibit 237, showing Crutcher's head after debris was removed from over his face; exhibit 238, showing three entrance wounds in the back of Crutcher's head after his head had been shaved by the medical examiner; and exhibit 239, showing the right side of Crutcher's face with an exit wound above his right eye.

Regarding exhibit 149, the State argued that the disarray of McCaulley's clothing, particularly her bra strap and the "shavings" on her back, was relevant to show that she

had been dragged on the garage floor into the utility room. Regarding exhibit 157, the State argued that the photograph was "probative of the setting" and relevant to show "the position of the child relative to the furnishings and the other items in the house." The State also argued that the photograph was not unduly prejudicial because it was taken "a considerable distance away." Regarding exhibit 162, the State argued that the photograph was relevant to show that Campbell's pregnancy was obvious. Regarding exhibit 196, the State argued that the photograph was relevant to show the shoestring tied around Brown's wrist and that the photograph was not unduly prejudicial because Brown's face could not be seen. Regarding exhibits 236 and 237, the State argued that the photographs were relevant to show the insect activity on Crutcher's face and establish Crutcher's time of death. Regarding exhibit 238, the State argued that the photograph of the three entrance wounds was relevant to show premeditation. Regarding exhibit 239, the State acknowledged that the photograph was relevant to show that one of the bullets exited Crutcher's head and may have entered the dashboard of the Elantra. The trial court ruled that the photographs were relevant and that their probative value was not substantially outweighed by the danger of unfair prejudice. The State introduced exhibits 149, 157, 162, and 196 into evidence during Agent Wesson's testimony, and exhibits 236, 237, 238 and 239 into evidence during Dr. Ward's testimony.

The decision regarding the admissibility of photographs lies within the sound discretion of the trial court and that ruling will not be overturned on appeal absent a clear showing of an abuse of that discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); State v. Lacy, 983 S.W.2d 686, 694 (Tenn. Crim. App. 1997). In order to be admitted as evidence, a photograph must be relevant to an issue at trial. Tenn. R. Evid. 402; State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993). As stated previously, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, even relevant photographs may be excluded if their probative value is substantially outweighed by the danger of unfair prejudice to the defendant. Tenn. R. Evid. 403; Banks, 564 S.W.2d at 951.

Initially, we note that the while the trial court found the eight photographs at issue admissible, the court found others inadmissible. For example, the court excluded two close-up photographs of Ragland, which the court described as "very disturbing," and a photograph of Brown in the bathtub, which the court described as "redundant." As to the eight photographs admitted into evidence, we agree that they were relevant to the State's case for the reasons espoused by the State. Moreover, we have reviewed each one, and none of them is particularly gruesome. Granted, the photograph of Ragland is more prejudicial than the others due the fact that it involves a very young victim. However, as noted by the State, the photograph was taken from a distance away, which lessened its

prejudicial effect. Thus, we conclude that the trial court properly found the photographs admissible.

## F. Jury Instructions

Finally, the appellant contends that the trial court erred by instructing the jury on Tennessee Pattern Jury Instructions 42.19, inferences in general, and 42.27, inference of concealment of evidence, because the instructions "were tantamount to the trial court commenting upon - and agreeing - that proof of concealment of evidence by the Defendant had been introduced at trial." He also contends that the instruction on the concealment of evidence directed the jurors to conclude that any evidence of concealment was suitable evidence of an intentional killing. The State argues that the instructions fully and accurately stated the law, did not mislead the jury, and were supported by the evidence at trial. We agree with the State.

During a jury charge conference, defense counsel objected to the two instructions and argued that "bringing up inferences and starting to talk about specific type[s] of inferences highlights that type of evidence unnecessarily." Defense counsel also argued that the instruction on the inference of concealment of evidence was an improper comment on the evidence by the court and that the court would be "endorsing that sort of finding." The trial court noted that the latter instruction was "a pretty new TPI" but that "we charge inferences all the time." The trial court also noted that a footnote to the latter instruction provided that the court "should instruct the jury with respect to inferences" and stated, "It is really an instruction that seems to cut both ways to me. It very much says and states that the defendant can not be found guilty on this fact alone."

In the jury charge, the court instructed the jury on "Inferences: Generally" as follows:

> The court has charged the jury concerning an inference that the jury may make in regard to certain evidence in this case. However, the jury is not required to make this inference. It is the exclusive province of the jury to determine whether the facts and circumstances shown by all the evidence in the case warrant the inference which the law permits the jury to draw. The inference may be rebutted by direct or circumstantial evidence or both, whether it exists in the evidence of the state or is offered by the defendant. Although the defendant is not required by law to do so, when the defendant offers an explanation to rebut the inference raised, you should consider such explanation along with all

the evidence to determine not only the correctness of the inference, but also the reasonableness of the defendant's explanation. You are not bound to accept either the inference or the defendant's explanation. The state must prove beyond a reasonable doubt every element of the offense before the defendant can be found guilty.

T.P.I.-Crim. 42.19. The court also instructed the jury on "Inference of Concealment of Evidence" as follows:

Any attempt by a person to conceal evidence is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt. While that inference is by no means strong enough of itself to warrant conviction, yet it may become one of a series of circumstances from which guilt may be logically inferred. Whether the evidence presented proves beyond a reasonable doubt that the defendant so acted is a question for your determination. If this fact is proven, this fact alone does not allow you to find that the defendant is guilty of the crime alleged. However, since an attempt by a defendant to conceal evidence may be caused by a consciousness of guilt, you may consider this fact, if it is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant. On the other hand, a person entirely innocent of a particular crime may attempt to conceal evidence and this may be explained by proof offered, or by the facts and circumstances of the case. Concealment of evidence of a crime is not proof of premeditation.

Whether there was any attempt to conceal evidence by the defendant, the reasons for it, and the weight to be given to it, are questions for you to determine.

T.P.I.-Crim. 42.27.

"It is well settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." Dorantes, 331 S.W.3d at 390. We have previously noted that "[w]e must review the entire [jury] charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to

the applicable law." State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995). Generally, a charge "is erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). "In order to determine whether a conviction should be reversed on the basis of an erroneous instruction to the jury, this Court must consider whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." State v. James, 315 S.W.3d 440, 446 (Tenn. 2010) (citations omitted). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005).

The trial court's inference instructions were a verbatim recitation of the Tennessee Pattern Jury Instructions. As noted by the trial court, a footnote for each of the instructions provides that the trial court "should instruct the jury with respect to inferences." See T.P.I.-Crim. 42.19 fn.1; T.P.I.-Crim. 42.27 fn.1. The instruction on the inference of concealment of evidence clearly advised the jurors that whether the appellant concealed evidence was a question for their determination, that concealment of evidence alone was not enough to find the appellant guilty, and that the jury could consider the concealment of evidence "with all the other evidence." Moreover, the general instruction on inferences advised the jury that it was not required to make the inference and that the State was still required to prove every element of the crimes beyond a reasonable doubt. The State presented evidence that Burrell and the appellant tried to conceal McCaulley's and Crutcher's bodies, that the appellant hid Crutcher's AK-47's under the appellant's bed, and that the appellant disposed of clothing, weapons, and Crutcher's bankcard. Thus, we conclude that the trial court did not err by giving the instructions.

### III. Conclusion

Based upon the record and the parties' briefs, we conclude that the evidence is sufficient to support the convictions; that the trial court's refusing to allow the jury to view Vinnie Crutcher's video-recorded interview did not deny the appellant his right to due process; that the trial court improperly allowed Bridgette McGraw Holdren to testify that the appellant asked if the police had a certain amount of time to charge him with a crime but that the error was harmless; that the trial court properly denied his requests for a mistrial; that the trial court properly admitted photographs into evidence; and that the trial court properly instructed the jury. Accordingly, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE